1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CRITTERS OF THE CINEMA, INC., a California Corporation,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**NESTLE PURINA PETCARE CO., a Missouri corporation, and DOES 1 through 20, inclusive,**<br><br>**Defendants** | **CASE NO. 1:16-CV-0123 AWI JLT**<br><br>**ORDER ON MOTION TO CHANGE VENUE AND ORDER TRANSFERRING MATTER TO THE WESTERN DIVISION OF THE CENTRAL DISTRICT OF CALIFORNIA**<br><br>(Doc. Nos. 9, 12) |

This case was removed from the Kern County Superior Court and arises from a contractual dispute between Plaintiff Critters of the Cinema ("Critters") and Defendant Nestle Purina Petcare Co. ("Nestle"). Critters alleges claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with prospective economic advantage, and declaratory relief. Nestle now moves to transfer this matter under 28 U.S.C. § 1404(a) to the Eastern District of Missouri, and also moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Per the Court's request under *Costlow v. Weeks*, 790 F.2d 1486 (9th Cir. 1986), the parties have submitted briefing regarding a § 1404(a) transfer to the Central District of California. For the reasons that follow, the Court will transfer this matter to the Central District of California.

## FACTUAL BACKGROUND

From the Complaint, in 1995, Critters began working with Nestle under various written agreements.  Critters was to *inter alia* train, maintain, make available, and provide cats to Nestle for use in advertising "Fancy Feast" brand cat food.  In exchange for these services, Nestle agreed to pay Critters certain fees and expenses.

In March 2010, Critters and Nestle entered into a new service contract ("the Contract"), whereby Critters agreed to make available and provide a minimum of two particular breeds of cats for use by Nestle in its advertising (on camera or personal appearance use) through March 2020.  The Contract contains allegedly "one-sided" clauses in favor of Nestle:  a "dissatisfaction" and a "cure 'satisfaction'" clause.  The two clauses provide that, in the event Nestle is dissatisfied with Critters's services, Nestle is to provide Critters with written notice detailing the areas of deficiency.  Critters would then have 30 days to cure the deficiency.  The clauses provide that, after 30 days, if Nestle determines "in its sole discretion" that Critters has failed to make satisfactory improvement, Nestle can terminate the Contract.  The Contract also contains a clause that required Critters to be the owner of the cats.  The clause provides that Critters warrants and represents that it is the owner of the cats and has full authority to enter into the Contract and perform all obligations under the Contract.

 On December 30, 2013, Critters and Nestle were both named as defendants in a lawsuit filed in the San Francisco Superior Court.  This lawsuit was allegedly a sham.  The lawsuit falsely alleged that Critters was not the sole owner of the cat Aladdin (a cat Critters provided to Nestle under the Contract), and further falsely alleged that Critters mistreated Aladdin.

On July 31, 2014, Nestle sent Critters a letter in which Nestle provided notice of its intent to terminate the Contract based on Nestle's "dissatisfaction."  The letter explained that Nestle was dissatisfied because of the sham lawsuit.  Nestle did not want to be associated with Critters when Critters was accused of failing to support standards and values cultivated by Nestle, or utilizing methods which violate the humane ideals that are the criteria by which Nestle operates.  Nestle also was dissatisfied with the allegation that Critters did not own Aladdin.  Although Nestle gave Critters 30 days to cure the dissatisfaction, Nestle allegedly had no intent to act in good faith

because it had already decided to terminate the Contract.  The July 31 letter stated that Nestle believed that the deficiencies were incapable of correction.  Given this position, Nestle made it contractually impossible to cure under the Contract.

On August 25, 2014, Critters responded in good faith to Nestle.  Critters adamantly denied the allegations in the sham lawsuit.  Critters denied that it or its employees mistreated any cats or behaved in a manner that compromised Nestle's standards or values.  In support of this assertion, Critters provided notarized attestations from several individuals, including a veterinarian.  Critters also provided Nestle with evidence that it owned Aladdin.

Despite the allegations of the sham lawsuit, Nestle still hired Critters to perform the exact services it was to perform under the Contract on April 29, 2014, on May 5, 2014, and June 5, 2014.[1]  Critters performed without incident and to Nestle's satisfaction.

On September 12, 2014, Nestle sent Critters a letter terminating the Contract.  Nestle acknowledged that Critters had cured the alleged deficiencies, but still terminated the Contract based on a "perception," and not based on deficiencies in Critters's services.  The decision to terminate was allegedly arbitrary, capricious and unreasonable, in light of the information provided by Critters and Critters' history and years of unblemished service to Nestle.  Nestle completely failed to substantiate, investigate, or use the discovery process with respect to the allegations of the sham lawsuit.

On September 18, 2014, the state court dismissed the sham lawsuit.  As of January 1, 2016, no appeal of the dismissal had been taken, and the plaintiff in the sham lawsuit has not attempted to re-file her case.

Critters alleges that the termination by Nestle breached the Contract, and that Nestle's conduct breached the implied covenant of good faith and fair dealing.  Critters also alleges that

---

[1] The Complaint is somewhat ambiguous.  Critters lists these dates as dates on which "Defendant hired Plaintiff to perform the exact services Plaintiff was to perform under the [Contract]."  The nature of the allegation suggests that, after Nestle terminated the Contract, it nevertheless hired Critters on three more occasions.  However, April 29, 2014, May 5, 2014, and June 5, 2014, are all days that pre-date the termination, and thus, would have been days in which Critters performed pursuant to the Contract.  That is, Nestle would not have "hired" Critters on those days, rather Nestle would have simply requested Critters perform its obligation under the Contract on those days.  It is possible that Critters meant to allege dates that occurred in 2015.  It is also possible that Critters is focusing on dates that post-date the sham lawsuit but pre-date the termination.  For now, the Court merely notes the ambiguity.

1  Nestle knew of Critters's business relationship and prospects in the animal training industry.

2  However, Nestle's termination of the Contract, along with Nestle's subsequent conduct and

3  contact with third parties, has effectively blackballed and destroyed Critters's business and

4  reputation.  Nestle's conduct has interfered with Critters's business relationships and prospective

5  business relationships.

6

7  **I.     MOTION TO CHANGE VENUE**

8      *Defendant's Argument*

9      Nestle argues that the relevant considerations show that this case should be transferred to

10  the Eastern District of Missouri ("EDMO").  First, the contract at issue has a broad choice of law

11  clause that sets Missouri law as the governing law.  The EDMO will be more familiar with the

12  governing law than the Eastern District of California ("EDCA").

13      Second, the EDMO has a strong relationship to the dispute.  Nestle, 11 current and retired

14  employees, and at least 3 third party witnesses are all located in the St. Louis area.

15      Third, the EDMO is less congested than the EDCA.  The EDMO has about half the case

16  load as the EDCA, and also has three more judges than the EDCA.

17      Fourth, there are numerous witnesses for whom the EDMO is a more convenient forum.

18  There are a number of Nestle employees who worked on the television and advertising team

19  involving Critters, and those employees all reside in the Saint Louis, Missouri area.  There are

20  third party entities who worked with Critters directly as part of advertising and public relations

21  activities.  Avrett, Free, & Ginsberg, LLC is based in New York, and was involved in television

22  advertising and briefing Critters on what the cats would do for photoshoots.  MRA

23  Advertising/Production Support Services, Inc. ("MRA") was involved in television advertising

24  costs and budgeting, including the expenses for Critters.  MRA is based in Ohio, but the employee

25  who worked with Nestle and Critters resides in Michigan.  Thompson Design Group ("TDG") is

26  based in California, and worked with Critters concerning what the cats should do for photoshoots.

27  MSL Group Americas is a New York based public relations firm that communicated with Critters

28  regarding public relations events.  Check Mark PR ("CMPR") is a subsidiary of Nestle that

communicated with Critters regarding public relations events.  CMPR and its 3 employees who worked with Critters are located in the St. Louis area. The nature and quality of these witnesses' testimony is central to the million dollar tortious interference claim.  The current and former Nestle employees can all address whether they engaged in the alleged tortious conduct or knew of Nestle employees who did.  The third party witnesses can attest to whether they heard anything from their Nestle counterparts that would support Critters's claims.  All of the witnesses could be expected to affirm the value of the Fancy Feast brand and the reasons supporting Nestle's cure notice and termination.  Given the location of these witnesses, the EDMO is more convenient.

In supplemental briefing, Nestle argues that the Central District of California ("CDCA") is a more appropriate forum than the EDCA.  Nevertheless, for the same reasons that the EDMO is a more convenient and appropriate forum than the EDCA, it is also more convenient than the CDCA.  There are numerous witnesses in the EDMO, and the EDMO is more familiar with the governing law.

### *Plaintiff's Opposition*

Critters argues that a transfer of venue is unwarranted.  California is an obvious forum choice.  Critters resides in California, and Nestle maintains a facility in Maricopa, California.  The contract at issue was entered into in California, all of the Fancy Feast cats reside in California, all of the cat training occurred in California, and all of the Fancy Feast advertising/filming occurred in California.  That is, everything relevant to the complaint occurred in California.  California has a strong connection to this case, and the choice to bring this suit in California is entitled to deference.

With respect to Court congestion, this is a relatively disfavored consideration.  The EDCA is not so congested that it cannot hear this case.

With respect to witnesses, primary consideration is given to third parties, as opposed to the employees of a party.  Those third parties will be inconvenienced by having to travel to another state, be it California or Missouri, and there is no assertion that any third party witnesses are unable to travel to California.  There is also no assertion that any particular witness will be unwilling to testify in the absence of compulsory process.  Further, Defendants have given only

1   general assertions and explanations of what non-party witnesses might say.  There is no

2   description of specific testimony or specific relevance.  Defendants have not shown

3   inconvenience, rather there is merely a list of names with generalized descriptions.

4       Finally, Nestle's resources vastly exceed Critters's resources.  Critters is a family owned

5   business that is run by one person.  Nestle is the second largest pet food company globally and the

6   largest in the United States.

7       In supplemental briefing, Critters states it does not oppose a transfer to the CDCA.  Critters

8   is "semi-located" in the CDCA, and travel to the CDCA is easier than travel to the EDMO.

9       *Legal Standard*

10      28 U.S.C. § 1404(a) provides in relevant part: "For the convenience of parties and

11  witnesses, in the interest of justice, a district court may transfer any civil action to any other

12  district or division where it might have been brought . . . ."  28 U.S.C. § 1404(a).  This statute

13  partially displaces the common law doctrine of *forum non conveniens*.  See Decker Coal Co. v.

14  Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986).  The purpose of § 1404(a) is "to

15  prevent the waste of time, energy, and money and to protect litigants, witnesses and the public

16  against unnecessary inconvenience and expense."  Van Dusen v. Barrack, 376 U.S. 612, 616

17  (1964).  "Section 1404(a) is intended to place discretion in the district court to adjudicate motions

18  for transfer according to an 'individualized, cases by case consideration of convenience and

19  fairness.'"  Stewart Organization, Inc. v. RICOH Corp., 487 U.S. 22, 29 (1988).

20      The "defendant must make a strong showing of inconvenience to warrant upsetting the

21  plaintiff's choice of forum."  Decker, 805 F.2d at 843.  In deciding whether to transfer under

22  § 1404(a), courts consider *inter alia*:  (1) the location where the relevant agreements were

23  negotiated and executed; (2) the state that is most familiar with the governing law; (3) the

24  plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the forum's

25  contacts with the plaintiff's cause of action; (6) the differences in the costs of litigation in the two

26  forums; (7) the availability of compulsory process to compel attendance of unwilling non-party

27  witnesses; (8) the ease of access to sources of proof; (9) the presence of a forum selection clause

28  (which is a "significant factor"); (10) the relevant public policy of the forum state, if any; (11)

1 convenience of the parties; (12) convenience of the witnesses; (13) local interest in the

2 controversy; (14) court congestion of the two forums; and (15) feasibility of consolidating other

3 claims.  See Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); Hawkins v.

4 Gerber Prods. Co., 924 F.Supp.2d 1208, 1213 (S.D. Cal. 2013); Barnes & Noble, Inc. v. LSI

5 Corp., 823 F.Supp.2d 980, 994 (N.D. Cal. 2011); Metz v. United States Life Ins. Co., 674

6 F.Supp.2d 1141, 1145-46 (C.D. Cal. 2009).

7          *Discussion*

8          The parties do not dispute that this case could have been filed in either the EDMO or the

9 CDCA.  With respect to the EDMO, because Nestle is a Missouri corporation headquartered in St.

10 Louis, Nestle is subject to personal jurisdiction in the EDMO.  See 28 U.S.C. §§ 1391(b)(1),

11 (c)(2); Lightfoot v. Cendant Mort. Corp., 769 F.3d 681, 689 (9th Cir. 2014).  With respect to the

12 CDCA, Critters is located in the CDCA, all cats (including Aladdin) would have been kept, cared

13 for, and trained by Critters in the CDCA, the notice of dissatisfaction and termination were

14 received in the CDCA, and Critters's attempts to cure Nestle's dissatisfaction occurred in the

15 CDCA.  Cf. Decker Coal, 805 F.2d at 842 (holding that breach of contract claims arise at the place

16 of intended performance).  Further, because Critters is based in the CDCA, the harm from the

17 tortious interference claim would have been felt in the CDCA.  See Myers v. Bennett Law Offices,

18 238 F.3d 1068, 1076 (9th Cir. 2001); United Tactical Sys., LLC v. Real Action Paintball, Inc., 108

19 F.Supp.3d 733, 755 (N.D. Cal. 2015).  Therefore, "substantial parts" of Critters's claims occurred

20 in the CDCA.  See 28 U.S.C. § 1391(b)(2); Myers, 238 F.3d at 1076; Decker Coal, 805 F.2d at

21 842; United Tactical, 108 F.Supp.3d at 755.  Since this matter could have been filed in the EDMO

22 or the CDCA, the Court will examine whether a transfer to either of these districts is appropriate.

23          1.     Location Where The Contract Was Negotiated and Executed

24          It is not clear where the Contract was executed or negotiated.  There is no evidence

25 regarding negotiations in general, much less where the negotiations actually occurred or through

26 what medium (face to face, telephone, fax, e-mail, etc.).  There is also little evidence regarding

27 where the Contract was executed.  A copy of the Contract indicates that it was sent to the CDCA.

28 See Leas Dec. Ex. A.  This suggests that Critters executed the Contract in the CDCA, but that

7

Nestle executed the Contract in the EDMO.  No evidence suggests that any negotiations or execution occurred in the EDCA.  Therefore, this factor weighs in favor of transfer out of the EDCA, and equally supports transfer to either the EDMO or the CDCA.

> ### 2.  State Most Familiar With The Governing Law

The Contract has a broad choice of law clause.  "This [Contract] and all matters and issues collateral thereto shall be governed by and determined according to the laws of the State of Missouri, without regard to conflict of law principles."  See Leas Dec. Ex. A at ¶ 6(i).  Critters does not dispute that Missouri law governs each of its claims.  The EDMO sits in Missouri and is more familiar with the governing law than the EDCA or the CDCA.  Therefore, this factor weighs in favor of a transfer to the EDMO.

> ### 3.  Plaintiff's Choice Of Forum

Generally, a plaintiff's choice of forum is given substantial weight.  See Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987); Park v. Dole Fresh Vegetables, Inc., 964 F.Supp.2d 1088, 1094 (N.D. Cal. 2013).  However, other considerations will lessen the weight to be given a plaintiff's choice of forum.  See Park, 964 F.Supp.2d at 1094.  A plaintiff's choice of forum will be given less weight if the plaintiff does not reside in the forum, or if the conduct giving rise to the plaintiff's claims occurred in another forum.  See Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1168 (10th Cir. 2010); Park, 964 F.Supp.2d at 1094; Williams v. Bowman, 157 F.Supp.2d 1103, 1107 (N.D. Cal. 2001).

Here, Critters clearly chose the EDCA when it filed suit in Kern County.  However, Critters's principal place of business is Lake Hughes, California.  See Complaint ¶ 1.  Lake Hughes California is located within the CDCA.  For purposes of venue, a corporate plaintiff resides "only in the judicial district in which it maintains its principal place of business."  28 U.S.C. § 1391(c)(2).  Therefore, Critters resides in the CDCA, not in the EDCA.  Furthermore, it does not appear that any of the conduct that forms the bases of Critters's claims occurred in the EDCA.  With respect to the contract claims, Critters's opposition states that the cats are located in California, and that the filming and training of the cats occurred in California.  However, because Critters is located in the CDCA, it is reasonable to conclude that such conduct actually occurred in

the CDCA.  There is nothing to suggest that the identified conduct occurred in the EDCA.  With

respect to the tort claim, there is no information regarding what potential contractual relationships

were interfered with, where the interference occurred, or where Critters's services would have

been rendered to its potential business partners/clients.  Because Critters is located in the CDCA,

nothing suggests that any tortious interference by Nestle occurred within the EDCA.

Critters argues that Nestle maintains "its business" in Maricopa, California, which is in

Kern County and the EDCA.  However, according to Nestle's website,[2] Nestle has a

manufacturing facility in Maricopa where it manufactures "Tidy Cats" brand cat litter.  While

Nestle clearly has a tangible presence in the EDCA, the services at issue in this case relate to

"Fancy Feast" brand cat food, not "Tidy Cats" brand cat litter.  There is no evidence that the

Nestle facility in Maricopa is related in any way to Critters' claims.

Therefore, because Critters does not reside in the EDCA, and there is no indication that

relevant conduct occurred within the EDCA, this factor weighs against a transfer, but in a

substantially diminished capacity.  See Park, 964 F.Supp.2d at 1094.

Nevertheless, Critters has stated that the CDCA is a convenient and acceptable forum.

Also, as discussed above, Critters resides in the CDCA and relevant conduct occurred in the

CDCA.  Therefore, this factor will also weigh in favor of a transfer to the CDCA.  But, because

the CDCA was not Critters's first choice, it weighs in favor of a transfer to the CDCA in a

somewhat reduced capacity.  Cf. id. (noting that a forum that is a plaintiff's second choice is given

less weight than the plaintiff's first choice).

4.    Parties' Contacts With The Forum

Critters has not shown that it has any contacts with the EDCA.  Nestle maintains its "Tidy

Cats" manufacturing facility in the EDCA.  Nestle's contact with the EDCA is diminished in that

the manufacturing facility involves cat litter, not cat food.  On balance, this factor weighs against a

transfer in a reduced a capacity.

5.    Forum's Contacts With The Plaintiff's Cause Of Action

As discussed above under the third factor, no material connection to the EDCA is apparent.

---

[2] https://www.nestlepurinacareers.com/blog/locations/living-and-working-in-maricopa-california.

1    Therefore, this factor weighs in favor of transfer out of the EDCA.

2           With respect to the CDCA, there are substantial contacts with Critters's claims.  As to

3    Critters's contract claims, the Contract would have been largely performed by Critters in the

4    CDCA, as this is where Critters would have kept, cared for, trained, and made available the cats.

5    As discussed above, the CDCA is where the breach of contract claim arises.  See Decker Coal, 805

6    F.2d at 842.  As to Critters's tort claim, as stated above, it is unknown where the potential business

7    partners/clients were located or where the services would have been rendered.  However, the harm

8    from the tortious interference claim would have been felt by Critters in the CDCA, and the

9    location where the injury/harm is felt is relevant to determining venue.  See Myers, 238 F.3d at

10   1076; United Tactical, 108 F.Supp.3d at 735.

11          With respect to the EDMO, the Court can say that the decision to terminate the Contract

12   was made by Nestle in the EDMO.  See Leas Dec. ¶¶ 6, 8, 9.  It is also possible that some of the

13   contractual negotiations may have occurred within that EDMO.  However, that is the most that can

14   be said at this time.

15          On balance, this factor weighs in favor of a transfer to the CDCA.

16          6.      Differences In Litigation Costs Between The Two Forums

17          The parties have not submitted evidence regarding the litigation costs in the EDCA, the

18   CDCA, or the EDMO.  Therefore, this is a neutral factor.

19          7.      Compulsory Process For Unwilling Non-Party Witnesses

20          The parties have not identified any witnesses who are unwilling to testify.  Of the

21   witnesses that have been identified, the EDCA and the CDCA could only compel the California

22   witnesses of San Francisco based TDG to testify.  The EDMO could only compel the 14 witnesses

23   who live in Missouri to testify.  However, these witnesses include 10 current Nestle employees

24   and 3 employees of a Nestle subsidiary.  Since Nestle can compel these witnesses to attend any

25   court, Lax v. Toyota Motor Corp., 65 F.Supp.3d 772, 779 (N.D. Cal. 2014); In re Yahoo!, Inc.,

26   2008 U.S. Dist. LEXIS 20605, *11-*12 (C.D. Cal. Mar. 8, 2010), the California districts' inability

27   to compel their testimony is irrelevant.  As for the third party witnesses in Michigan and New

28   York, none of the three districts can compel their testimony.  On balance, this is a neutral factor.

8.     Ease Of Access To Sources Of Proof

The parties have not submitted evidence on this point.  Nestle is the only party to have produced documents, and those documents are not extensive.  Furthermore, to the extent that e-mails or electronically stored documents may be involved, such evidence can likely be "transported" and printed without great difficulty.  See Body Sci. LLC v. Boston Sci. Corp., 846 F.Supp.2d 980, 995 (N.D. Ill. 2012).  Without more from the parties, this is a neutral factor.

9.     Presence Of A Forum Selection Clause

The parties have not identified a forum selection clause.  Therefore, this is a neutral factor.

10.     Relevant Public Policy Of The Forum State

The parties have not discussed or identified any California public policy that may be implicated by this case.  Therefore, this is a neutral factor.

11.     Convenience Of The Parties

Nestle is a large corporation that has a manufacturing facility within the EDCA. Furthermore, Nestle's supplemental opposition states that the CDCA is a more convenient forum than the EDCA.  There is nothing to indicate that Nestle is unable to litigate in the EDCA or the CDCA, or that litigating in the EDCA or CDCA would constitute an unreasonable burden on Nestle.

In contrast, Critters's opposition states that Critters is a family owned business that is run by one person.  Because Critters is located in the CDCA, little inconvenience would be involved in the CDCA.  Further, although Critters does not appear to have a presence in the EDCA, the EDCA is much closer to Lake Hughes than the EDMO.  Critters's Complaint alleges that, because of Nestle's conduct, Critters has been blackballed and had its business and reputation destroyed. These allegations indicate that Critters has diminished resources.  Compared to the burden on Nestle of litigating in the EDCA or the CDCA, there would be a greater burden on Critters in litigating in the EDMO.

Because it appears that there would be a greater burden on Critters in litigating in the EDMO, this factor weighs against a transfer to the EDMO.  Instead, because Critters is actually located in the CDCA, this factor weighs in favor of a transfer to the CDCA.

11

1          12.     Convenience Of The Witnesses

2          The convenience of witnesses is often considered the most important consideration in

3    determining whether to transfer a case under § 1404.  See Hawkins, 924 F.Supp.2d at 1215; Metz,

4    674 F.Supp.2d at 1147.  In order to properly assess the convenience of witnesses, the parties

5    should identify the witnesses, the location of the witnesses, and the content and relevance of the

6    witnesses' testimony.  See Lax, 65 F.Supp.2d at 779; Florens Container v. Cho Yang Shipping,

7    245 F.Supp.2d 1086, 1092-93 (N.D. Cal. 2002).  Courts are not to simply consider the number of

8    witnesses listed by a party, rather courts are to consider the nature and quality of each witness's

9    testimony.  See Vesta Corp. v. Amdocs Mgmt., 129 F.Supp.3d 1012, 1036 (D. Or. 2015); Metz,

10   674 F.Supp.2d at 1147.  Thus, the convenience of "key witnesses" is accorded greater weight than

11   "non-key witnesses."  Mid-Continent Cas. Co. v. Petroleum Solutions, Inc., 629 F.Supp.2d 759,

12   763 (S.D. Tex. 2009); see Amazon.com v. Cendant Corp., 404 F.Supp.2d 1256, 1260-61 (W.D.

13   Was. 2005).  Additionally, because employers can compel the testimony of their employees,

14   considerably less weight is given to the convenience of a party's employee-witness, as opposed to

15   a true third-party witness.  See Vesta Corp., 129 F. Supp. 3d at 1036; Lax, 65 F.Supp.3d at 779;

16   Hawkins, 924 Supp.2d at 1215; Metz, 674 F.Supp.2d at 1147.  Similarly, unless evidence is

17   presented that suggests otherwise, because former employees are likely to voluntarily testify on

18   behalf of their former employers, former employees are viewed in the same light as current

19   employees.  See Vesta Corp., 129 F.Supp.3d at 1036-37.

20         Critters has not identified any witnesses, but Nestle has identified 17 witnesses.  Of the 17

21   witnesses, 14 reside near or in St. Louis, Missouri, 2 reside in New York, and 1 resides in

22   Michigan.  See Leas Dec. ¶¶ 2, 3, 4, 6, 8, 11, 13, 14, 17, 18.

23         With respect to the Missouri witnesses, 10 witnesses are current employees of Nestle, 1

24   witness is a retired Nestle employee, and 3 witnesses are currently employed by CMPR (a

25   subsidiary of Nestle).  For purposes of this motion, the Court views the 3 witnesses employed by

26   CMPR as employees of Nestle, because these witnesses would be under Nestle's control.  See

27   Audatex N. Am., Inc. v. Mitchell Int'l, Inc., 2013 U.S. Dist. LEXIS 90847, *15-*16 (D. Del. June

28   28, 2013) (treating a party's employees and the employees of the party's subsidiary the same for

12

1   purposes of § 1404(a)); In re Yahoo!,, 2008 U.S. Dist. LEXIS 20605 at *11-*12 (same).

2   Therefore, each of the 14 total Missouri witnesses will be viewed as Nestle "employees," and their

3   convenience is afforded substantially reduced weight.  See Vesta Corp., 129 F.Supp.3d at 1036-

4   37; Lax, 65 F.Supp.3d at 779; Audatex, 2013 U.S. Dist. LEXIS 90847 at *15-*16; Metz, 674

5   F.Supp.2d at 1147.

6          Additionally, the Court finds that, as described, the testimony of a number of the Missouri

7   witnesses would be of limited relevance.  See Vesta Corp., 129 F.Supp.3d at 1036 (courts are to

8   consider the nature and quality of the testimony).  Nestle has indicated that the one retired witness

9   (Tim Hanneke) signed the Contract in March 2010 on behalf of Nestle.  See id. at ¶¶ 5, 6.

10  However, there is no dispute that the Contract exists, so testimony about signing the document has

11  little relevance.  Nestle has indicated that the three witnesses employed by CMPR (Emily

12  Goldkamp, Gordon Wade, and Julie Catron) worked with Critters while the Contract was in effect.

13  However, simply working with Critters for some unknown period of time on an unknown number

14  of projects is alone not particularly relevant.  There is nothing to indicate that these individuals

15  expressed dissatisfaction to "Fancy Feast" brand managers about Critters, provided input on the

16  decision to terminate the Contract, or had contact with or interfered in possible relationships with

17  potential or existing Critters clients.  Further, to the extent that they could support Nestle's

18  rationale for terminating the Contract, the testimony of all three witnesses would be redundant.  As

19  to five of the current employees (Gina Garren, Katie Fiamingo, Courtney Louch, Lisa Luedde, and

20  Carey Mullen), Nestle indicates that they "have knowledge concerning the performance of the

21  Agreement by [Nestle] and [Critters]."  Leas Dec. ¶ 11.  However, as the Court understands the

22  allegations in the Complaint, Nestle's notice of dissatisfaction (Ex. C to Leas Declaration), and the

23  written termination notice (Ex. E to Leas Declaration), the purported reason for the termination of

24  the Contract was the allegations in the lawsuit, specifically the true ownership of Aladdin and how

25  Aladdin (and possibly other cats) were treated by Critters.  There is no indication that Nestle was

26  dissatisfied with Critters's performance prior to the lawsuit.  Knowledge of Critters's performance

27  in general has some relevance, but evidence regarding the specific aspects of Critters's

28  performance that Nestle found dissatisfactory is highly relevant.  There is no indication that these

13

1  five witnesses have such knowledge.  Finally, Nestle has indicated that one other current employee

2  (Amanda Culbertson-Kraemer) was a Brand Manager of Fancy Feast and the predecessor of a

3  manager who was involved in the termination decision (Andrea Leas).  However, there is no

4  indication that this witness was involved in the decision to terminate or had knowledge of any

5  dissatisfaction by Nestle with Critters's performance.  At this time, it appears that any evidence

6  that Culbertson-Kraemer could offer would have minimal relevance.  Therefore, in sum, the

7  testimony of these Missouri witnesses appears to be of limited relevance and possibly redundant,

8  and none of these witnesses appear to be "key witnesses."  See Vesta Corp., 129 F.Supp.3d at

9  1036; Mid-Continent, 629 F.Supp.2d at 763.

10       In contrast, the remaining four Missouri witnesses appear to be "key witnesses" who have

11  highly relevant testimony.  See id.  Andrea Leas, Tad Stricker, Stacy Bacilek, and Heather Scott

12  all appear to have been involved in the decision to terminate the Contract.  See Leas Dec. Exs. C,

13  E.  These witnesses either wrote the relevant correspondences to Critters, or were copied on the

14  correspondences.  See id.  It is reasonable to assume that these witnesses either collectively made

15  the decision to terminate the Contract, or provided input to the ultimate decision-maker.  However,

16  because these are current employees that Nestle can compel to attend any court, their

17  inconvenience is given substantially reduced weight.  See Vesta Corp., 129 F.Supp.3d at 1036-37;

18  Lax, 65 F.Supp.3d at 779; Metz, 674 F.Supp.2d at 1147.

19       With respect to the two New York witnesses (Lynne Kruger and Molly Kelly) and one

20  Michigan witness (Larry Haggart), these witnesses appear to be employees of third party public

21  relations/advertising firms who worked on projects with Critters for the Fancy Feast brand.  See

22  Leas Dec. ¶¶ 12, 13, 14, 17.  These firms do not appear to be subsidiaries of Nestle, and there is

23  nothing to indicate that Nestle can compel attendance of these individuals to the EDMO, the

24  EDCA, or the CDCA.  Although the CDCA is easily reached through Los Angeles's airport, both

25  the CDCA and the EDCA are significantly farther from New York and Michigan than the EDMO.

26  Therefore, the convenience of these witnesses weighs in favor of a transfer to the EDMO.

27  However, the relevance of any testimony from these witnesses appears to be limited.  Like other

28  witnesses, there is no indication that these individuals expressed dissatisfaction to "Fancy Feast"

14

1  brand managers about Critters, witnessed abusive conduct by Critters, provided input on the

2  decision to terminate the Contract, or had contact with or interfered in possible relationships with

3  potential or existing Critters clients.  All that can be said is that these witnesses participated in an

4  unknown number of projects at unknown times with Critters.[3]  There is nothing to indicate that

5  these witnesses actually have relevant information about the tortious interference claim or contract

6  claims, and Nestle does not need a parade of public relations experts to justify its decision to

7  terminate the Contract.  Therefore, the testimony of these witnesses appears to be of limited

8  relevance and possibly redundant, and none of these witnesses appear to be "key witnesses."  <u>See</u>

9  <u>Vesta Corp.</u>, 129 F.Supp.3d at 1036; <u>Mid-Continent</u>, 629 F.Supp.2d at 763.

10      On balance, Nestle has demonstrated that the EDMO is a more convenient location for the

11  witnesses it has identified.  Therefore, this factor favors a transfer to the EDMO.  However, the

12  weight that will be given to this factor is substantially reduced either because the witnesses'

13  testimony appears to be of limited relevance, or because the witnesses are "employees" of Nestle.

14  <u>See</u> <u>Vesta Corp.</u>, 129 F.Supp.3d at 1036-37; <u>Lax</u>, 65 F.Supp.3d at 779; <u>Metz</u>, 674 F.Supp.2d at

15  1147; <u>Mid-Continent</u>, 629 F.Supp.2d at 763.

16      13.    Local Interest In The Controversy

17      With respect to the EDCA, there is very little, if any, local interest in this case.  Although

18  there is a significant dispute with Nestle, and Nestle has a manufacturing facility within the

19  EDCA, that facility manufactures "Tidy Cats" brand cat litter, it does not manufacture "Fancy

20  Feast" brand cat food.

21      With respect to the EDMO, Nestle's headquarters are in St. Louis, and it appears that the

22  "Fancy Feast" brand is managed from St. Louis.  <u>See</u> Leas Dec. ¶ 2.  Based on these

23  considerations, the EDMO has a significant local interest in this case.

24      With respect to the CDCA, Critters is located in Lake Hughes.  Critters appears to be a

25  small business that has had a contractual relationship with Nestle for about 20 years.  Because of

26  
27  _____
[3] As indicated above, the public relations firm TDG of San Francisco, California is also identified by Nestle, but no contact person is listed.  Without a contact person identified, the Court cannot make a clear determination about inconvenience.  If the Court were to assume that a contact person is in California, then the EDCA and the CDCA would be more convenient to that witness than the EDMO.  However, for the same reasons as the New York and Michigan witnesses, the TDG witness's testimony would appear to have limited relevance.

28

1  Nestle's actions, it is alleged that Critters's business and reputation has been all but destroyed.

2  Given the allegations of the damage done to a local business, the CDCA has a significant local

3  interest in this case.

4       On balance, this factor weighs in favor of a transfer out of the EDCA, and equally supports

5  transfer to either the EDMO or the CDCA.

6       <u>14.</u>   <u>Court Congestion Of The Forums</u>

7       As of December 31, 2015, the EDCA had 7,630 cases pending, the EDMO had 4,422 cases

8  pending, and the CDCA 12,474 cases pending.  <u>See</u> Table – U.S. District Courts – Combined Civil

9  and Criminal Federal Court Management Statistics (December 31, 2015).[4]  The median time to

10  trial from the date of filing in civil cases in the EDMO is 29.9 months, the median time in the

11  EDCA is 36.5 months, and the median time in the CDCA is 21.1 months.  <u>See id.</u>  The EDMO has

12  a total of 12 full time and senior district judges, the EDCA has a total of 9 full time and senior

13  district judges, and the CDCA has a total of 33 full time and senior district judges.[5]  These

14  statistics show that the EDCA is the most congested of the three districts – it has less judges and a

15  greater median time to trial than either the EDMO or the CDCA.  Although the CDCA has a

16  significantly higher number of pending cases than either the EDMO or the EDCA, the CDCA has

17  enough judges that the median time to trial is lower than the EDMO by approximately 9 months.

18  The CDCA is "less congested" than the EDCA and the EDMO.  Therefore, this factor weighs in

19  favor of transfer to the CDCA.

20       <u>15.</u>   <u>Feasibility Of Consolidating Other Claims</u>

21       The parties have not identified any claims that may be related to or could be consolidated

22  with this case.  Therefore, this is a neutral factor.

23       <u>*Conclusion*</u>

24       Factors 6, 7, 8, 9, 10, and 15 are neutral.  Factors 3 and 4 weigh against a transfer, but

25  Factor 3 does so on a significantly reduced basis because Critters does not reside in the EDCA,

[4] This Table can be found at:  http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/12/31-3.

[5] The number of full time and senior judges in each district can be found at each district's website: http://www.caed.uscourts.gov, http://www.moed.uscourts.gov, and http://www.cacd.uscourts.gov.

16

1   and it does not appear that the events that form the basis of the Complaint occurred in the EDCA.

2   See Park, 964 F.Supp.2d at 1094.  Further, Factor 4 only weighs slightly against a transfer.

3   Factors 1, 2, 12, and 13 weigh in favor of a transfer to the EDMO.  However, because of

4   ambiguity, Factor 1 is given a reduced weight.  Further, Factor 12 is given significantly reduced

5   weight because most of the witnesses are considered employees, or otherwise under the control, of

6   Nestle, or the testimony many of the witnesses does not appear particularly relevant.  see Vesta

7   Corp., 129 F.Supp.3d at 1036-37; Lax, 65 F.Supp.3d at 779; Metz, 674 F.Supp.2d at 1147; Mid-

8   Continent, 629 F.Supp.2d at 763; In re Yahoo!, 2008 U.S. Dist. LEXIS 20605 at *11-*12.  Finally,

9   Factors 1, 3, 5, 11, 13, and 14 weigh in favor of a transfer to the CDCA.  However, as is the case

10  with respect to the EDMO, Factor 1 is given reduced weight because of ambiguity.  Further,

11  Factor 3 is given reduced weight because the CDCA was not Critters's first choice of forum.

12       The factors that are not neutral show that the EDCA is the least convenient forum of the

13  districts at issue.  Only two reduced or "light weight" factors support keeping the matter in the

14  EDCA.  The EDMO and the CDCA each have more factors that favor them than the EDCA.  As

15  between the EDMO and the CDCA, both districts share Factors 1 and 13 equally.  Those factors

16  essentially cancel each other out.  Factors 3 and 12 are different, but are generally highly

17  important factors to plaintiffs and defendants, respectively.  However, Factors 3 and 12 are given

18  reduced weight, as discussed above.  This leaves only Factor 2 fully in favor of the EDMO, but

19  leaves Factors 4, 11, and 14 fully in favor of the CDCA.  The Court finds that the totality of the

20  factors shows that the CDCA sufficiently outweighs the EDCA and the EDMO so as to warrant a

21  § 1404(a) transfer to that district.  Therefore, this case will be transferred to the CDCA.[6]

22

23  **II.    MOTION TO DISMISS**

24       On the same day that Nestle filed its § 1404(a) motion to transfer, it also filed a Rule

25  12(b)(6) motion to dismiss.  Because the Court has determined that a transfer to the CDCA is

26  proper, it is appropriate for the CDCA to resolve Nestle's Rule 12(b)(6) motion.  The Court

27  expresses no opinions on Nestle's Rule 12(b)(6) arguments.

28

[6] Because Critters resides in Los Angeles County, the Court will transfer this case to the CDCA's Western Division.

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendant's motion to transfer to the Eastern District of Missouri (Doc. No. 12) is DENIED; and

2.    Pursuant to 28 U.S.C. § 1404(a) and *Costlow v. Weeks*, 790 F.2d 1486 (9th Cir. 1986), this matter is TRANSFERRED forthwith to the Western Division of the Central District of California.

IT IS SO ORDERED.

Dated:   May 24, 2016                          _____

                                               SENIOR  DISTRICT  JUDGE

18